Emiliano Malizia, Esq.
LAMURA, MALIZIA, RASILE & PARTNERS LLP
8383 Wilshire Blvd 8th FL
Beverly Hills, CA 90211
State Bar #298545
Phone: +1 323 989 7014
Email: emiliano.malizia@tlrtlaw.com
*Attorneys for Plaintiffs Prof. Giulio Caracciolo and Dipartimento di Medicina Molecolare,*
*Sapienza Università di Roma*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PROF. GIULIO CARACCIOLO and DIPARTIMENTO DI MEDICINA MOLECOLARE, SAPIENZA UNIVERSITÀ DI ROMA,<br><br>Plaintiff,<br><br>v.<br><br>THE BRIGHAM AND WOMEN'S HOSPITAL INC., SEER INC., DR. MORTEZA MAHMOUDI AND DR. OMID FAROKHZAD,<br><br>Defendant. | No.<br><br>**COMPLAINT** |

Prof. CARACCIOLO and DIPARTIMENTO DI MEDICINA MOLECOLARE SAPIENZA UNIVERSITÀ DI ROMA (DEPARTMENT OF MOLECULAR MEDICINE SAPIENZA UNIVERSITY OF ROME) ("CARACCIOLO" and "SAPIENZA', jointly "Plaintiffs"), by and through their counsel, sue THE BRIGHAM AND WOMEN'S HOSPITAL INC., SEER INC., DR. MORTEZA MAHMOUDI and DR. OMID FAROKHZAD, individually ("HOSPITAL", "SEER", "MAHMOUDI", "FAROKHZAD", jointly "Defendants"), and state as follows:

### NATURE OF THE CASE

1. This action seeks correction of patent family WO2018/112460 under U.S. Code Title 35, to name Prof. Giulio CARACCIOLO as joint inventor, and SAPIENZA as joint owner, recovery of unpaid royalties, and recovery of attorney fees and damages in an amount to be proven at trial.

**PARTIES**

2. Plaintiff CARACCIOLO is a Professor and Researcher at the Dipartimento di Medicina Molecolare (Department of Molecular Medicine) at SAPIENZA UNIVERSITY OF ROME, and Italian citizen resident at Rome, Via Duccio di Buoninsegna 76, 00142, Rome, Italy. SAPIENZA is an Italian primary University with its main office located at Piazzale Aldo Moro 5, 00185, Rome, Italy. Plaintiff SAPIENZA employs Professor CARACCIOLO at its

Department of Molecular Medicine located at Viale Regina Elena 291, 00161, Rome, Italy.

3. Defendant THE BRIGHAM AND WOMEN'S HOSPITAL, INC. is a corporation with principal office at 75 Francis St, Boston, MA 02115, United States. Defendant SEER INC. is a Corporation formed in Delaware, registered in California with regular and principal place of business at 3800 Bridge Pkwy, Redwood City, CA 94065, United States. Defendant DR. MAHMOUDI is an Associate Professor at Michigan State University, with principal address at 426 Auditorium Road, East Lansing, MI 48824, where he should reside. Defendant DR. FAROKHZAD is a Senior Lecturer at THE BRIGHAM AND WOMEN'S HOSPITAL, and Chair and Chief Executive Officer of SEER INC., with regular and established place of business at 3800 Bridge Parkway Redwood City, CA 94065.

**JURISDICTION AND VENUE**

4.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. 1338(a), and supplemental jurisdiction thereto.

5.      This is a civil action arising, among other things, under an Act of Congress related to patents. This is a civil action for non joinder of inventors, fraud, unjust enrichment, breach of covenant of good faith and fair dealing, and violation of the RICO Statute.

6.      This Court has personal jurisdiction over Defendants because Defendant SEER INC., of which FAROKHZAD is the Chief Executive Officer, has its headquarters and principal

place of business located within this judicial district. Furthermore, MAHMOUDI receives royalties from SEER for the licensed patent, and SEER is a licensee of HOSPITAL for the patent at issue.

7.     There is also diversity of jurisdiction since Plaintiffs are citizens of Italy and the amount at stake is over $75,000.00.

8.     Venue is proper in this Court pursuant to 28 U.S.C. 1391(b)(1) because Defendant SEER resides in this judicial district; pursuant to 28 U.S.C. 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims herein occurred in this judicial district; and pursuant to 28 U.S.C. 1391(b)(3) because Defendants are subject to personal jurisdiction in the judicial district.

## FACTS APPLICABLE TO ALL COUNTS

9.     At all times material, included from 2015 until now, Prof. CARACCIOLO has worked as a Professor and Researcher at the Dipartimento di Medicina Molecolare (Department of Molecular Medicine) at SAPIENZA UNIVERSITY OF ROME, Italy.

10.     In 2013, Prof. CARACCIOLO was one of the leading researchers included in the Protocol entitled "*Nuove tecnologie per l'identificazione di biomarcatori proteici nell'adenocarcinoma pancreatico: Uno studio pilota.*" ("*New technologies for the identification of protein biomarkers in the pancreatic adenocarcinoma: a pilot study*"), approved by the Ethics. Committee of the Campus Bio-Medico in Rome on September 16, 2013 (Exhibit A and Exhibit B).

11.     The objective of the study was to: "*fully characterize the protein corona adsorbed to a combination of cationic liposomes after interaction with the plasma of patients with pancreatic adenocarcinoma. These results will be compared with the protein composition of the corona adsorbed onto the same nanoparticles after interaction with the plasma of the healthy control group. The identification of differences in protein profiles between patients with malignancy and healthy subjects could lead to the identification of new biomarkers for the diagnosis of the disease*" *Id*.

12.     CARACCIOLO was a recognized expert in the field of liposomes and the protein corona of liposomes; as early as 2014, he had a well-established understanding of the role of the lipid species selected from the group DOPG (l,2-dioleoyl-5n-glycero-3-phospho-(l'-rac-glycerol),

1   DOTAP        (l,2-Dioleiyl-3 trimethylammonium-propane)-        DOPE

2   (dioleoylphosphatidylethanolamine), CHOL (DOPC -Cholesterol), and combinations thereof, and

3   their composition of their protein corona, and he proposed the development of a liposome array

4   composed of the specific lipid species DOTAP, DOPC, DOPE, Chol, and DOPG in the approved

5   study protocol above mentioned. (Exhibit A and B).

6        13.    Upon information and belief, in 2015, Dr. MAHMOUDI, at all times material

7   Assistant Professor at THE BRIGHAM AND WOMEN'S HOSPITAL, INC., Harvard Medical

8   School, Boston, was in communication through the LinkedIn social network with Prof. Giulio

9   CARACCIOLO, Professor and Researcher at the Dipartimento di Medicina Molecolare

10  (Department of Molecular Medicine) at SAPIENZA.

11       14.    On June 14, 2015, MAHMOUDI offered CARACCIOLO to collaborate on a project

12  on protein corona, aimed at the development of a technology to obtain early diagnosis of cancer

13  based on the use of nanoparticles. The project involved the development of a technology for tumor

14  diagnosis based on the use of an array of nanoparticles; each type of nanoparticle, following

15  exposure to the plasma of a human subject, becomes coated with a layer of proteins known as the

16  "protein corona" in the international scientific community. Because CARACCIOLO was an expert

17  in studying protein coronas of a specific type of nanoparticles called liposomes, composed of lipid

18  molecules, MAHMOUDI requested him to select some liposomes that could be employed for the

19  development of the technology.

20       15.    MAHMOUDI and CARACCIOLO reached an agreement and established a

21  respective role for the work to be performed. The main task was assigned to Plaintiffs and consisted

22  of the choice of the liposomes, the recruitment of cancer patients, and all the experimental part

23  related to the development of technology to obtain an early diagnosis of cancer based on the use of

24  nanoparticles, while the US researchers would have carried out the computational part consisting

25  of the processing of the data received from the Italian researchers.

26       16.    When MAHMOUDI proposed the research to CARACCIOLO, CARACCIOLO's

27  lab had already been working on the project of diagnosing tumors using a sensor array of

28  nanoparticles, and CARACCIOLO communicated this to MAHMOUDI.

17.     At the time, the lab directed by CARACCIOLO had already characterized cationic liposome formulations before and after interaction with Human Plasma (HP), observing that they showed systematic differences in lipid composition. Furthermore, the charge of the liposomes plays a pivotal role in generating protein coronas, the compositions of which consistently vary between healthy subjects and oncology patients.

18.     CARACCIOLO possessed the indispensable expertise to identify the most suitable formulations of liposomes for the development of diagnostic technology. Notably, his laboratory had previously demonstrated in a study published in 2014 that the protein corona of liposomes is intricately linked to the health status of the patient.

19.     In his correspondence to MAHMOUDI, CARACCIOLO explained: "*In detail, we have data for both section 2 (toxicity and uptake) and section 3 (part I part II). If TEM core sizes is a useful descriptor for liposomes too, we should complete the data set collecting TEM images (section 3, part III). So, I wonder whether cationic liposomes are a suitable class of NPs for your QSAR investigation and if 14 formulations are enough. In case we could extend the study to anionic and charge-neutral liposomes, we have already data for one class of charge-neutral liposomes and two more formulations of anionic liposomes before and after interaction with HP (17 formulations in total). In addition, we have data for one class of silica NPs and we could collect data from gold and silver NPs (5 more formulations in total). I don't know if mixing organic and inorganic NPs in a single QSAR study makes sense, but, in case it does, this is another opportunity we have. We have also been collecting blood samples from patients with diseases, but we need time to complete the patients' enrollment and to make all the experiments.*" (Emphasis added).

20.     In 2016, when CARACCIOLO and MAHMOUDI started collaborating on the project, CARACCIOLO had already worked for 15 years on liposome formulations, and he was the expert that suggested the liposome formulations for the project to MAHMOUDI.

21.     During the project with MAHMOUDI, CARACCIOLO identified the three (3) types of lipid nanoparticles, which represent the most important base for the research and completion of the project, and which are strictly necessary to organize the trial experiments.

22.     Furthermore, CARACCIOLO also identified the pathologies to be used in the

research regarding the proper functioning of the sensor array.

23.     Plaintiffs' sensor array is made up of three different types of liposomes, each with its unique makeup of lipids and surface charge. Instead of searching for a specific biomarker in the patient's blood, the sensor array recognizes patterns in the proteins that stick to the liposomes. To check if it works, CARACCIOLO and his Italian team tested it using blood samples from people with five different types of cancer (lung cancer, pancreatic cancer, meningioma, glioblastoma and myeloma) and compared the results with samples from healthy individuals.

24.     The work performed by CARACCIOLO consisting, among other things, in the selection of the nanoparticles and the specific cancers to base the experiments was extremely important, relevant and linked to the results of the research, as also confirmed by US Examiner in the Notice of Allowance to patent US10866242 (Exhibit C).

25.     Based on the agreement with MAHMOUDI, CARACCIOLO and his team at the Dipartimento di Medicina Molecolare (Department of Molecular Medicine) at SAPIENZA identified the formulations of the nanoparticles to use, recruited the oncologic patients, obtained their sera and conducted the trial experiments regarding the characterizations of the protein coronas of three formulations chosen.

26.     CARACCIOLO recruited the oncologic patients at SAPIENZA, the Bio- Medical campus in Rome, the University of Naples Federico II, and the University Hospital of neurosurgery at Federico II U.O.C. The collection of human plasma from healthy as well as cancer patients was approved by the Ethical Committees of SAPIENZA UNIVERSITY OF ROME, the University of Napoli Federico II, and the University Campus Bio -Medico of Rome.  Defendants never requested any approval or raised any ethical concern regarding the collection of human plasma.

27.     CARACCIOLO, together with another researcher at SAPIENZA, collected and kept in SAPIENZA's laboratories, the serum of the oncologic patients, conducted experiments on the three formulations, and sent the experiments results to MAHMOUDI, who conducted the computational analysis of the data received. (Exhibit G, 8-11).

28.     MAHMOUDI and the US researchers, including FAROKHZAD, performed only the computer analysis of the results received from CARACCIOLO and his team at SAPIENZA.

29.     On or about October 3, 2016, MAHMOUDI requested CARACCIOLO and his team at SAPIENZA not to publish the data obtained to international congresses and keep all information and data highly confidential to *protect the idea*.

30.     Suddenly, on December 16, 2016, without any notice to CARACCIOLO, Provisional application No.62/435,409 was filed, listing as inventors MAHMOUDI and FAROKHZAD from THE BRIGHAM AND WOMEN'S HOSPITAL, INC., Boston, MA (USA). (Exhibit D).

31.     Nothing about the patent application was ever shared with CARACCIOLO nor SAPIENZA.

32.     On or about January 9, 2017 the scientific article *Protein Corona Sensor Array Predicts Cancers* was presented for publications by the authors MAHMOUDI, CARACCIOLO, and other researchers, included FAROKHZAD. Such article contained the results of the project between MAHMOUDI and CARACCIOLO and stated that a novel sensor array was developed to identify variations in the composition of protein coronas linked to various liposome nanoparticle sensors; this capability to discern shifts in the patterns of protein corona composition associated with each sensor element enables the creation of a distinct "disease fingerprint" which can accurately differentiate between the healthy and diseased states of subjects.

33.     Surprisingly, the article was rejected by several reviews and was not published until 2019, in the journal Nanoscale Horizons (Nanoscale Horiz., 2019, 4, 1063). (Exhibit E).

34.     Generally, when an article is presented for publication, an email of at least successful submission is received by all the authors, or, at times like in this case, only by the submitting one. Oddly enough, it was not until December 2018 that MAHMOUDI shared the emails received by editors with CARACCIOLO; all prior emails from MAHMOUDI regarding publication simply contained information allegedly reported by editors and reviewers, but nothing was ever directly shared with CARACCIOLO. Of importance is the fact that the first email shared by MAHMOUDI in December 2018 by the review nBME was in reality received by FAROKHZAD.

35.     During the research, MAHMOUDI, along with post-doctoral fellow Dr. Corbo requested to CARACCIOLO a protocol for the preparation of the three liposomes, and they

continued to request CARACCIOLO's assistance in order to reproduce the three particles as they lacked the capability to independently generate liposomes with the requisite physicochemical properties, a necessary step for the proper functioning of the sensor array composed of the three particles. Even after Dr. Corbo's relationship with HOSPITAL ended, she often contacted CARACCIOLO asking for information. The request to CARACCIOLO for a protocol on liposome preparation is an unequivocal demonstration that it was impossible for MAHMOUDI and coworkers to have chosen them themselves, as they lacked the knowledge on how to prepare liposomes.

36.     On December 18, 2017, the HOSPITAL filed a PCT request with the title "*System and method for protein corona sensor array for early detection of diseases*", claiming the priority of the provisional application 62/435,409 (US) filed on 16 Dec 2016, with international publication on June 21, 2018, as WO2018112460A1 (Exhibit D).

37.     Once more, CARACCIOLO and SAPIENZA were never informed of the 2017 PCT request.

38.     The application contained mostly data and images from CARACCIOLO's and the Italian scientists' research within the project with MAHMOUDI. (Exhibit G, 8-11, and 11-15)

39.     Once more and without notice to CARACCIOLO or SAPIENZA, on or about January 26, 2018, the patent application US20180172694, now granted patent US10866242, was filed in United States. National patent applications were also filed in Australia, Canada, China, Europe, Great Britain, Japan, Mexico, as well as an additional four patents granted in Germany, which were filed on the same date of the international application that claimed the priority of the provisional application 62/435,409 (US) filed on 16 Dec 2016. (Exhibit D)

40.     On or about April 15, 2018, MAHMOUDI mentioned to CARACCIOLO a company that was "*using our technology*", provided him with a LinkedIn link to the company – that appeared to be named SEER- and requested CARACCIOLO not to share any info with them.

41.     On or about April 21, 2018, MAHMOUDI introduced Dr. FAROKHZAD, the Director of the Center for   Nanomedicine at   the HOSPITAL, to   CARACCIOLO.   Dr. FAROKHZAD requested to be involved in the Project with MAHMOUDI and CARACCIOLO,

but, oddly, MAHMOUDI continued to include in his communication only CARACCIOLO; FAROKHZAD was particularly interested in plasma preparation, as well as materials and methods of the project, and CARACCIOLO provided him with the experimental materials and methods.

42.     That same year, SEER Inc. was registered in the United States, California, with Omid FAROKHZAD, M.D. as Chief Executive Officer. SEER utilized and currently continues to use a proteomic technology for the diagnosis of cancers, the same technology developed by CARACCIOLO and subject of the scientific article above and the above PCT application. SEER raised million dollars of investments using the technology developed by CARACCIOLO as a different and more effective way to early detect certain types of cancers.

43.     Upon information and belief, in 2018, FAROKHZAD and MAHMOUDI ended their cooperation. FAROKHZAD, CEO at SEER, continues as a Professor at HOSPITAL, while MAHMOUDI moved to teach at Michigan State University.

44.     In August 2018, CARACCIOLO and MAHMOUDI met in Boston, but MAHMOUDI did not share further information about the company nor any issues with FAROKHZAD; on the contrary, he avoided such topics and focused the meeting on other, collaborative projects between them. It was only in July 2019 that MAHMOUDI disclosed to CARACCIOLO that *his idea was stolen* and a few people there (at HMS, Harvard Medical School) *started a company based on his discovery*.

45.     At the end of 2018, MAHMOUDI founded the *Academic Parity Movement*, against academic bullying towards subordinates, based on the fact that MAHMOUDI himself had been a victim.

46.     On or about February 8, 2019, MAHMOUDI informed CARACCIOLO that he would like to reduce the authors of their articles to be published on Nanoscale Horizons to the original author lists, thus excluding FAROKHZAD, stating that "*they used our technology to start a company and left us behind*".

47.     On or about June 17, 2019, CARACCIOLO and MAHMOUDI, among others published on the journal Nanoscale Horizons the article that had been requested for publication since January 2017, regarding the results of the Project (Nanoscale Horiz., 2019, 4, 1063).

Originally, the article had also FAROKHZAD as coauthor, but the 2019 publication did not include him. (Exhibit E)

48.     In such article, with the purpose of continuing to hide this important information to CARACCIOLO, MAHMOUDI made no reference to the patent filed, although some of the images published in the article correspond to the images included in the patent family.

49.     The abstract of the article states: *By combining the concepts of disease-specific protein corona and sensor array technology we developed a platform with disease detection capacity using blood plasma. Our sensor array consists of three cross-reactive liposomes, with distinct lipid composition and surface charge. Rather than detecting a specific biomarker, the sensor array provides pattern recognition of the corona protein composition adsorbed on the liposomes. As a feasibility study, sensor array validation was performed using plasma samples obtained from patients diagnosed with five different cancer types (i.e. lung cancer, glioblastoma, meningioma, myeloma, and pancreatic cancer) and a control group of healthy donors.* The same project protected by the patent family.

50.     On or about July 11, 2019, as mentioned above, MAHMOUDI communicated to CARACCIOLO that his "*idea was stolen and a few people there started a company based on my discovery*".

51.     On or about January 25, 2021, per a request dated March 25, 2020, and accepted on December 22, 2020, MAHMOUDI published an article on *Nature Communications (Nature Communications volume 12, Article number: 573 (2021)*, where the section Ethics Declarations: Competing interests indicates that MAHMOUDI obtains royalties from SEER Inc. "*Dr. MAHMOUDI discloses that he receives royalties/honoraria for his published books, plenary lectures, and licensed patent (to Seer Inc)*" (Exhibit F). MAHMOUDI   never mentioned to CARACCIOLO or SAPIENZA anything about perceiving royalties.

52.     Once more and without knowledge or information by Plaintiffs, on November 9, 2020, a US patent application US2021311064 A1 entitled "*System And Method For Protein Corona Sensor Array For Early Detection Of Diseases*" was filed as a continuation of the patent US10866242B2, and as a continuation of the latter, the US patent application US2021293801 A1

was filed on 9 March 2021; both of those two patent application are still pending and under examination.

53.    Once more and without knowledge or information by Plaintiffs, on November 16, 2020, US patent application US2021072255 A1 entitled "*System And Method For Protein Corona Sensor Array For Early Detection Of Diseases*" was filed, as a continuation-in-part of the patent US10866242B2, which was followed by three divisional applications filed on March 29, 2021; the patent application US2021072255 A1 was abandoned, while the three divisional applications US20210311039 A1, US20210318321 A1, US20210311040 A1 are still pending and under examination.

54.    In all the above mentioned patents, the listed applicant and inventors are the same: THE BRIGHAM AND WOMEN'S HOSPITAL, INC., applicant; Dr. FAROKHZAD, Dr. MAHMOUDI, sole inventors. In some, Dr. Corbo is also listed as inventor.

55.    It is thus not surprising that CARACCIOLO and SAPIENZA were never informed of those filings and were never told about the patent applications.

56.    In 2020, SEER, using as a brand the technology developed by Plaintiffs, undertook the process of being listed into the NASDAQ's market. As of today, SEER is listed on the NASDAQ's market.

57.    In April 2022 SAPIENZA engages the Italian Patents Society to assess the inventorship of the patent family WO2018/112460 filed by HOSPITAL, and, specifically, the contribution of CARACCIOLO and the Italian Universities to the invention as defined in the claims of the patents/patent applications of the family WO'460. (Exhibit G).

58.    The Italian Patents Society examined the data and information exchanged between Plaintiffs and Defendants, and reached the conclusion the Plaintiff had substantially contributed to the Project and to the technology developed herein. *Id.*

59.    The expert opinion of the Italian Patents Society reports that "*the emails between Prof. Caracciolo and Prof. Mahmoudi prove that at least Prof. Caracciolo (but not necessarily the other researchers) was involved in the decision-making process of the kind of nanoparticles and the specific cancers to use*" and emphasizes how "[*T*]*his point might be very important, because*

1  *the selection of the nanoparticles (NP) and cancers to use in the invention are the main aspects of*

2  *the claimed invention. The relevance of the selection of the NP and the specific cancers over the*

3  *prior art is also confirmed by the US Examiner in the Notice of Allowance (Annex 8, in the see the*

4  *paragraph reasons for allowance page 2 of the communication) wherein it's reported that only*

5  *introducing these features in the claim the grant of the patent was allowed." Id.*

6       60.    The Italian Patents Society concludes the expert opinion stating that "***Prof.***

7  ***Caracciolo was involved not only in the realization of the experiments, but also in the inventive***

8  ***concept of the invention, hence he should be listed among the inventors of the patent family of***

9  ***WO'640***". (Emphasis added)

10       61.    In March 2023 SAPIENZA through his attorney reached out to HOSPITAL,

11  MAHMOUDI, FAROKHZAD, and SEER, requesting the inclusion of CARACCIOLO as joint

12  inventor on the patent and payment of royalties.

13       62.    As of today, notwithstanding the multiple requests by Plaintiffs to Defendants, no

14  agreement between the parties has been reached.

15                         **COUNT I – NON JOINDER OF INVENTORS**

16       63.    Plaintiffs reassert and incorporate by reference the allegations set forth in paragraphs

17  1 through 62 of this Complaint as if fully set forth herein.

18       64.    Under 35 USC § 101, the inventor is who invents or discovers. Under 35 USC §

19  116, when an invention is made by two or more persons jointly, they shall apply for a patent jointly,

20  even if (1) they did not physically work together or at the same time, (2) they each make the same

21  type or amount of contribution, or (3) each did not make a contribution to the subject matter of

22  every claim of the patent. Joint inventors must be working toward the same end, on the same subject

23  matter, and producing an invention by their aggregate efforts. *Kimberly-Clark Corp. v. Procter &*

24  *Gamble Distrib. Co*., 973 F.2d 911 (Fed. Cir. 1992). A joint inventor must contribute to the

25  invention's conception. *Ethicon, Inc. v. U.S. Surgical Corp*., 135 F.3d 1456, 1460-61 (Fed. Cir.

26  1998); *Fina Oil & Chem.Co. v. Ewen*, 123 F.3d 1466, 1473 (Fed. Cir. 1997) ("[T]o be a joint

27  inventor, an individual must make a contribution to the conception of the claimed invention that is

28  not insignificant in quality, when that contribution is measured against the dimension of the full

invention."). A person who shares in the conception of a claimed invention is a joint inventor of that invention. *VerHoef*, 888 F.3d 1362, 1366-67, 126 F.2d 1561, 1564-65 (Fed. Cir. 2018). Determination of proper inventorship focuses on the conception step, which is the touchstone of inventorship. *Burroughs Wellcome Co. v. Bar Labs*., Inc., 40 F.3d 1223, 1227-1228 (Fed. Cir. 1994) (citing *Sewall*, 21 F.3d at 415). Conception is normally defined as "the formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is thereafter to be applied in practice." *Id*.

65.     Whether inventor is to be read as the person who conceives the subject matter of at least one claim of the patent, or one of the persons who collaborate to produce the invention through aggregate efforts, because the invention was produced by aggregate efforts and CARACCIOLO contributed since the conception of the project patented, CARACCIOLO shall have been included as joint inventor in the patent application.

66.     From the time CARACCIOLO cooperated with MAHMOUDI on the research that originated the family patent, he was involved from the beginning of the project and as a decision-making party; particularly, CARACCIOLO's contribution was crucial in the decision regarding the kind of nanoparticles to be used, as described in CLAIM 14, and the specific cancers cell to use, as described in CLAIM 31.

67.     The selection of the nanoparticles and cancers to use in the invention are the main components and aspects of the claimed invention; their relevance over the prior art is also confirmed by the US Examiner in the Notice of Allowance wherein it is reported that only introducing these features in the claim was the main reason as to why the patent was allowed. (Exhibit C, and Exhibit G).

68.     As stated above, the sensor array of claim 13 describes the liposomes selected from the group consisting of DOPG (l,2-dioleoyl-5n-glycero-3-phospho-(l'-rac-glycerol), DOTAP(l,2-Dioleiyl-3 trimethylammonium-propane)-  DOPE  (dioleoylphosphatidylethanolamine),  CHOL (DOPC -Cholesterol), and combinations thereof, which is exactly what CARACCIOLO researched in his 2013 project.

69.     On the contrary, MAHMOUDI had absolutely no knowledge of the three liposomes

and their respective physicochemical properties.

70.     As expressly stated in CLAIM 102, the protein profile absorbed onto a specific nanoparticle is uniquely dependent on the physicochemical properties of the particle itself, with the consequence that the diagnostic capability of the sensor array is closely dependent on the selection of the three elements composing it; choosing different liposomes would have resulted in the formation of different protein profiles with a different diagnostic capability.

71.     Therefore, selecting the nanoparticles to base the experiments upon, was crucial to the patented invention.

72.     Equally crucial was the choice of cancer to use in the experiments, as the proper functioning of the sensor array which is the subject of the invention, is inseparably linked to the choice of cancer pathologies and does not work universally for all types of cancer.

73.     Because of his pre-existing studies and research, CARACCIOLO also identified the cancer types cited in CLAIM 31 of the patent; thus he, once more, fundamentally contributed to the idea behind the claims cited.

74.     As above stated, the idea of diagnosing tumors using a sensor array of nanoparticles was already ongoing in CARACCIOLO's lab when he started to collaborate with MAHMOUDI, as CARACCIOLO had started researching and experimenting within the same scope of the invention's subject within the study he participated in 2013 as described in Exhibit A, and as communicated to MAHMOUDI.

75.     The abovementioned claims were included in the 2017 PCT request, claiming the priority of the provisional application 62/435,409 (US) filed on 16 Dec 2016, and in the 2018 patent application US20180172694A, now granted patent US10866242B2. (See, generally, Exhibit D)

76.     Because CARACCIOLO importantly contributed to the conception of the project, in addition to the experimental part, he should be listed as one of the inventor in the patent, contrary to what Defendant HOSPITAL did.

77.     At all times material, CARACCIOLO was employed by SAPIENZA; as such, SAPIENZA should have also been included in the patent as owner, contrary to what defendant HOSPITAL did.

78.     WHEREFORE, Plaintiffs hereby request an order to have an amendment to the patent family of WO'640, under Title 35 of the U.S. Code, Section 256, have the identity of the inventors corrected, and include CARACCIOLO as joint inventor, and SAPIENZA as owner.

### COUNT II- PAYMENT OF ROYALTIES

### (Against Defendant SEER)

79.     Plaintiffs reassert and incorporate by reference the allegations set forth in paragraphs 1 through 78 of this Complaint as if fully set forth herein.

80.     SEER entered into a license agreement with HOSPITAL and MAHMOUDI. SEER is now a licensee of the patented invention and has been commercially exploiting the invention since its formation in 2017.

81.     FAROKHZAD is a listed inventor of the project and patent and CEO of SEER and thus has obtained, and continues to obtain, financial benefits from the invention.

82.     Defendants MAHMOUDI and HOSPITAL perceive royalties from SEER from the use licensed patent.

83.     As such, Defendants all economically exploited and continue to exploit the invention and perceive financial compensation from the patented invention.

84.     Plaintiffs CARACCIOLO, as joint inventor, and SAPIENZA, as owner, should be granted and paid royalties for the economic exploitation of the patented invention.

85.     WHEREFORE, Plaintiffs hereby request an order granting payment of past, present, and future royalties and/or compensation from the use of the invention.

### COUNT III- UNJUST ENRICHMENT

86.     Plaintiff reassert and incorporate by reference the allegations set forth in paragraphs 1 through 85 of this Complaint as if fully set forth herein.

87.     CARACCIOLO contributed to the concept, invention, and experimental phase of the patented invention.

88.     All Defendants perceive financial benefits from the patented invention.

89.     As such, CARACCIOLO and SAPIENZA conferred a benefit on Defendants who are financially exploiting and benefiting from the invention.

90.     Defendants all, jointly and severally, retain the benefit of CARACCIOLO's intellectual product.

91.     Under these circumstances, it would be inequitable for Defendants to retain these benefits without paying Plaintiffs for the value received.

## COUNT IV – BREACH OF IMPLIED COVENANTS OF GOOD FAITH AND FAIR DEALINGS

### (Against Defendant MAHMOUDI)

92.     Plaintiff reasserts and incorporates by reference the allegations set forth in paragraphs 1 through 91 of this Complaint as if fully set forth herein.

93.     MAHMOUDI and CARACCIOLO entered into an agreement- although verbal- where they would cooperate on a project for the benefit of both.

94.     While their cooperation was still ongoing, MAHMOUDI filed, without notice to Plaintiffs, a patent application with the USPTO.

95.     Additionally, he kept the patent application secret, and, misled CARACCIOLO by repeatedly promising publication in prestigious international scientific review journals, which were delayed from 2017 until 2019; years when patents were filed and SEER incorporated.

96.     If that was not enough, MAHMOUDI also entered into a licensing agreement with SEER and has obtained substantial profits from such agreement. He never included nor did he ever mention anything to Plaintiffs.

97.     There is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." *Comunale v. Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 658 [328 P.2d 198], internal citation omitted; see also *Carma Developers, Inc. v. Marathon Development California, Inc.*, 2 Cal.4th 342 , 371 , 6 Cal. Rptr. 2d 467 , 826 P.2d 710 (1992 ).

98.     Defendant MAHMOUDI had a duty to act in good-faith when performing his part of the deal.

99.     Defendant MAHMOUDI did not act in good faith when taking advantage of his part of the deal, while not performing his duties towards Plaintiff CARACCIOLO who was excluded

1   from the patented invention and the subsequent licensing agreement.

2       100.    Thus, Defendant MAHMOUDI acted in breach of the implied covenant of good

3   faith and fair dealing when cooperating on the bilateral project agreed upon with CARACCIOLO

4   and SAPIENZA.

5       101.    WHEREFORE, Plaintiffs hereby request an order against Defendants granting

6   royalties, compensation and damages to Plaintiffs.

7   **COUNT V – FRAUD**

8       102.    Plaintiffs reassert each of the preceding allegations as set forth in paragraphs 1

9   through 101 of this Complaint as if fully set forth herein.

10       103.    Defendant MAHMOUDI intentionally misrepresented CARACCIOLO in his

11   intentions to have them both benefit from the Project.

12       104.    By inducing CARACCIOLO to cooperate in the Project through the promise of

13   publication in prestigious international scientific journals- which did not occur, surprisingly,

14   during the two most relevant years of this proceeding- MAHMOUDI did not disclose the intent to

15   apply nor the actual application filed to patent the invention they both had contributed to.

16       105.    Nor did he disclose that he was entering into a licensing agreement with SEER, the

17   company that he, allegedly, opposed.

18       106.    Through his actions, MAHMOUDI intended to induce CARACCIOLO's reliance

19   on the misrepresentation to obtain his cooperation to the project.

20       107.    CARACCIOLO reasonably and detrimentally relied on these representations,

21   hoping to obtain international recognition for his work.

22       108.    CARACCIOLO to this day has not received any recognitions for his work, nor any

23   financial benefit, which, instead, all Defendants perceive thanks to CARACCIOLO'S contribution.

24       109.    As a result, Plaintiffs have been damaged in an amount to be determined at trial.

25   **COUNT VI - VIOLATIONS OF RICO, 18 U.S.C. § 1962**

26       110.    Plaintiffs reassert each of the preceding allegations as set forth in paragraphs 1

27   through 109 of this Complaint as if fully set forth herein.

28       111.    Defendants HOSPITAL and SEER are enterprises engaged in and whose activities

affect interstate commerce. At all relevant times, MAHMOUDI was a professor at HOSPITAL and he was the one who contacted and primarily interacted with CARACCIOLO for the research project. At all relevant times, FAROKHZAD was a professor at HOSPITAL, direct supervisor of MAHMOUDI, and he currently is the CEO of SEER. Together, Defendants associated in fact to conduct or participate to a fraudulent scheme they engaged in over several years.

112.    As set forth above, each Defendant agreed and conspired to violate 18 U.S.C. § 1962(c). Specifically, they devised a scheme to defraud and obtain recognition and financial benefits from the intellectual work of CARACCIOLO by means of fraud and fraudulent pretenses, representations, and promises made through the transmission of interstate wire communications.

113.    Each of the Defendants conspired to and participated in the conduct of the affairs of HOSPITAL and SEER through a pattern of racketeering activity.

114.    Each of the Defendants knew that their predicate acts were part of racketeering activity and agreed to the commission of those acts to further the schemes described above.

115.    Such conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

116.    As a direct and proximate result of Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962, CARACCIOLO and SAPIENZA were harmed as described above.

117.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs also are entitled to recover damages, plus costs and attorneys' fees from Defendants.

**WHEREFORE**, Plaintiffs demands judgment against Defendants as follows:

a)      For a judgment ordering the amendment of the patent to include Prof. CARACCIOLO of SAPIENZA UNIVERSITA' DI ROMA (University of Rome) as joint inventor;

b)      For a judgment ordering the correction of the patent to include SAPIENZA UNIVERSITA' DI ROMA (University of Rome) as owner;

c)      For a judgment for unpaid royalties in an amount to be determined at trial;

d)      For a judgment ordering payment of present and future royalties to Plaintiffs;

e)    For a judgement for restitutionary damages for unjust enrichment in an amount to be determined at trial;

f)    For a judgment for punitive damages in an amount to be proven at trial;

g)    For a judgment for accrued interests and costs, including attorney's fees, incurred in connection with this action; and

h)    For such other relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Prof. CARACCIOLO and DIPARTIMENTO DI MEDICINA MOLECOLARE SAPIENZA UNIVERSITA' DI ROMA demand a jury trial on all issues so triable.

Dated: December 19, 2023

Respectfully submitted,

*/s/Emiliano Malizia*

Emiliano Malizia, Esq.
LAMURA, MALIZIA, RASILE & PARTNERS LLP

8383 Wilshire Blvd 8th FL
Beverly Hills, CA 90211

Phone: +1 323 989 7014
Email: emiliano.malizia@tlrtlaw.com